UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES LEGRONE,

                Petitioner,

v.                                          CASE NO. 10-11846
                                          HONORABLE NANCY G. EDMUNDS

THOMAS BIRKETT,

                Respondent.

_____/

**OPINION AND ORDER**
**DENYING PETITIONER'S HABEAS CORPUS PETITION,**
**GRANTING IN PART A CERTIFICATE OF APPEALABILITY,**
**AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

Petitioner James LeGrone has filed a *pro se* habeas corpus petition, challenging his 1992 convictions for first-degree murder, MICH. COMP. LAWS § 750.316(1)(b), armed robbery, MICH. COMP. LAWS § 750.529, and possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b. Petitioner claims that he has new evidence of actual innocence and that the prosecution engaged in misconduct by threatening key witnesses and withholding exculpatory evidence from him. The Court finds no merit in these claims. Accordingly, the petition will be denied.

## I. Background

### A. The Charges, Trial, and Sentence

Petitioner was charged with first-degree (felony) murder, armed robbery, and felony firearm. The charges arose from the fatal shooting of Reginald Rayford (also known as "Butch") at his uncle's house on Richton Street in Detroit, Michigan. Petitioner was tried before a jury in the former Recorder's Court for the City of Detroit. The following witnesses

testified at his trial.

<u>Sharon Hughes</u>

According to Sharon Hughes, Walter Lee was living at 2244 Richton Street in March of 1991, and drugs were being sold there at the time. Ms. Hughes, Walter Lee, and other people were present on March 2, 1991, when Petitioner and another man came to the house shortly after midnight. She recognized Petitioner because he had been to the house a few days earlier to talk to Walter about selling drugs out of the house.

On March 2, 1991, Petitioner went into Walter's bedroom for four or five minutes. He came out of the bedroom with a .357 caliber gun in his hand. He pointed the gun at her and instructed the people there to take everything out of their pockets. He took "crack" and money from a teenage boy who sold drugs at the house.

During the robbery, Walter's nephew Butch came to the front door and knocked. Petitioner pointed the gun at Walter's head and escorted him to the door where Walter suggested to Butch that he return at a later time. As Petitioner opened the door, Butch ran off the porch. Shortly afterward, Ms. Hughes heard gunshots. A couple of days later, she viewed some pictures at police headquarters and identified Petitioner as the suspect.

On cross-examination, Ms. Hughes explained that she initially was arrested and taken to police headquarters for questioning. As the police were preparing to take her home, she was called back because someone had said she set up the robbery. At trial, she denied setting anyone up.

<u>Walter Lee</u>

Walter Lee testified that Petitioner and Javon Carter came to see him at 2244 Richton a few days before the shooting. The gist of their conversation was that Petitioner

2

wanted to sell heroin in Walter's house, but Walter would not allow it.  On March 2, 1991, Petitioner returned to his house with another person.  Petitioner reiterated that he wanted to sell heroin in Walter's house, but when they walked into Walter's bedroom, Petitioner pulled out a .357 caliber gun, pointed the gun at Walter, and announced a "stickup." Petitioner asked for drugs and money and said, "If you have any more than what you say, I'm going to shoot you."  Petitioner searched Walter and took a rock of cocaine and about $18 in cash from Walter.  When Petitioner asked whether anyone else in the house had a sack (bag of drugs), Walter responded that Renell, the teenage boy who was selling drugs there, had the sack.  Petitioner then put the gun back in his pocket and instructed Walter to walk into the living room as if nothing had happened.  When they got to the living room, Petitioner pulled out the gun and announced a robbery.  Petitioner's friend also pulled out a gun, and some six or seven people put their hands over their heads at the robbers' command.  Petitioner took money and cocaine from Renell and about $20 from a teenage girl.

A car then approached the house, and Petitioner said maybe someone was coming with money.  Petitioner instructed Walter to let the visitor come inside.  Walter's nephew Butch was standing at the door and invited Walter to go drinking with him and Walter's son. Walter declined the invitation, knowing what Petitioner's intentions were.  Petitioner then stepped from behind Walter, pointed the gun at Butch, and said, "Stickup."  Butch turned and ran down the stairs.  Petitioner fired seven or eight gunshots at Butch.  Both Petitioner and his friend chased Butch through a vacant lot.  Walter later found Butch lying on the ground about three houses away.  He had been shot.

A neighbor called the police, and a couple of days after the shooting, Walter picked

3

Petitioner's photograph out of a series of photographs.  He identified Petitioner as the person who committed the robbery and shooting.  Walter also attended a live lineup. Although he did not see Petitioner in the lineup, he saw someone that closely resembled him and said that he looked like the person who pulled the trigger.  He did not say that the person was Petitioner, and at trial, he was "positive" that Petitioner was "running the show" on March 2, 1991, that Petitioner had robbed the people at his house, and that Petitioner had fired at Butch.

Ronald Lee

Ronald Lee was Walter Lee's son and Reginald Rayford's (Butch's) cousin.  He testified that, on March 2, 1991, he and Butch went to visit his father at 2244 Richton Street.  When they got to his father's house, Butch exited the car and went up to Walter's house.  Ronald subsequently heard four or five gunshots and heard Butch run down the wooden stairs.  Butch went behind Ronald's car and hollered, "Oh, no."  Ronald went home because he did not see anything when he glanced at his father's house, and he did not see the direction in which Butch ran.

Javon Carter

Javon Carter testified that he and Petitioner went to Walter Lee's house about a week before the shooting because Javon wanted to talk with Walter.  He took Petitioner with him to "watch his back" in case he got into trouble.  On March 3, 1991, the police took Javon to the police station for questioning.  He informed the police that he did not know anything about the shooting.  The police officers locked him up overnight and told him that they were going to keep him there until he made a statement.  The next day, he  gave a statement to the police.  Initially, he told the police that Petitioner merely went with him to

4

Walter Lee's house and that Petitioner did not talk to Walter.  The police did not believe that version of the facts.  So he told the police what they wanted to hear:  that he and Petitioner went to Walter's house to check it out because they intended to sell Petitioner's "dope" at the house.

### Willie Pringle

Willie Pringle testified that, early on March 2, 1991, he was staying at his mother's house, which was located around the corner and across a field from Walter Lee's house.  Shortly after midnight, he heard gunshots.  He looked out the window and saw two or three men run through a vacant lot and jump in a car.  He did not recognize the men, but he informed a police officer that one of the men was Petitioner and that they got in Petitioner's car.  Pringle insisted at trial that he was unable to determine whether it was Petitioner that he saw running through the lot.  He explained that the reason he informed the police it was Petitioner was because the officer threatened to put him in jail for withholding evidence if he did not change his story.

### Odell Godbold and Albert Smith

Detroit police officer Odell Godbold testified that, on September 24, 1991, he went to a house on Hubbell Street in Detroit because he had received information that Petitioner was present at the house.  He and other police officers announced their presence, and when he looked in the basement window, he saw Petitioner running around, looking panicked.  His impression was that Petitioner was looking for a place to hide.  The officers forced their way into the house because the occupants refused to open the door.  Petitioner was arrested in the basement where he was sitting on a couch.

Police officer Albert Smith also observed Petitioner running around in the basement

5

at the house on Hubbell.  He saw Petitioner hide behind the sofa and then enter a closet.

### Sawait Kanluen

Dr. Sawait Kanluen testified that he recovered a bullet from the victim's chest during the autopsy.  The cause of death was three gunshot wounds, and the manner of death was homicide.  The victim was shot on the right side of his back, on the back of his right arm, and on the back of his left thigh.  The gunshot wound to the victim's back penetrated the lung and heart.

### Dale Johnston and Robert Gerds

Police Sergeant Dale Johnston testified as an expert in firearms examination.  He stated that the spent bullet in evidence could have been fired from a .357 caliber gun. Sergeant Robert Gerds testified that both Walter Lee and Sharon Hughes picked Petitioner's photograph out of an array of photographs and that the two identification procedures were conducted separately.

The parties stipulated that Walter Lee identified someone other than Petitioner during the live lineup.  Petitioner did not testify or present any witnesses.  His defense was that there was not enough evidence to conclude that he was the murderer or even present at the crime scene.  His attorney argued to the jury that Walter Lee and Sharon Hughes were not credible and that the police used improper tactics to elicit statements from Javon Carter and Willie Pringle.

On March 5, 1992, the jury found Petitioner guilty, as charged, of first-degree murder, armed robbery, and felony firearm.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of life imprisonment without the possibility of parole for the murder conviction and twenty-five to

forty years for the armed robbery conviction.

**B.  The Direct Appeal**

Petitioner appealed his convictions on grounds that (1) one juror was not competent to sit on the jury, (2) the prosecutor's closing argument was reversible error, (3) the introduction of hearsay testimony regarding the photographic identification constituted reversible error, (4) the prosecutor committed reversible error by introducing testimony concerning Petitioner's alleged drug dealing and other possibly criminal behavior, (5) the trial court erred when it instructed the jury on aiding and abetting, and (6) the errors complained of violated his right to due process of law.  The Michigan Court of Appeals affirmed Petitioner's convictions in a published decision.  *See People v. LeGrone*, 517 N.W.2d 270 (Mich. Ct. App. May 2, 1994).

Petitioner raised the same claims and two new claims about juror bias and trial counsel in an application for leave to appeal in the Michigan Supreme Court.  On December 28, 1994, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. LeGrone*, 527 N.W.2d 520 (Mich. 1994) (table).  On February 28, 1995, the state supreme court denied reconsideration, *see People v. LeGrone,* 530 N.W.2d 755 (Mich. 1995) (table).

**C.  The First Motion for Relief from Judgment and First Habeas Corpus Petition**

In 1997, Petitioner filed a motion for relief from judgment, claiming that trial counsel was ineffective, the trial court deprived him of a fair trial, and the prosecutor engaged in misconduct and suppressed evidence.  The trial court denied Petitioner's motion for relief from judgment on the basis that Petitioner had not satisfied the requirements of Michigan

Court 6.508(D).[1]  *See People v. LeGrone*, No. 91-11107 (3d Judicial Cir. Ct. Oct. 8, 1998).

Petitioner appealed the trial court's decision without success.  Both the Michigan Court of

Appeals and the Michigan Supreme Court denied leave to appeal for failure to establish

entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. LeGrone*, No.

218666 (Mich. Ct. App. Mar. 1, 2000); *People v. LeGrone*, 617 N.W.2d 558 (Mich. 2000)

(table).

On May 15, 2001, Petitioner filed a federal petition for the writ of habeas corpus in

the Eastern District of Michigan.  This Court granted the State's motion for summary

judgment and dismissed the habeas petition as untimely.  *See LeGrone v. Jones*, No. 01-

71667 (E.D. Mich. Dec. 4, 2001).  Petitioner appealed the Court's decision, but the Court

of Appeals for the Sixth Circuit declined to issue a certificate of appealability.  *See LeGrone*

*v. Jones*, No. 01-2707 (6th Cir. Sept. 23, 2002) (unpublished).

**D.  The Second and Third Motions for Relief from Judgment**

In 2006, Petitioner filed a second motion for relief from judgment in the trial court,

this time claiming that newly discovered evidence supported an alibi defense and that his

attorneys were ineffective.  The trial court denied the motion on the ground that Petitioner

had failed to meet the standards for newly discovered evidence and actual prejudice.  The

---

[1] Rule 6.508(D) prohibits state courts from granting relief from judgment if the movant alleges grounds for relief which were decided against the defendant in a prior appeal or post-conviction motion unless the defendant establishes that a retroactive change in the law has undermined the prior decision.  Relief also is prohibited if the movant alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal or in a prior motion unless the defendant demonstrates "good cause" for failure to raise such grounds on appeal or in the prior motion and "actual prejudice."

8

Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. LeGrone*, No. 268937 (Mich. Ct. App. Sept. 28, 2006).  On January 24, 2007, the Michigan Supreme Court denied leave to appeal because Petitioner 's motion for relief from judgment was prohibited by Michigan Court Rule 6.502(G).[2]  *See People v. LeGrone*, 725 N.W.2d 667 (Mich. 2007) (table).

Petitioner alleges that his wife subsequently learned from prosecution witness Willie Pringle that the police threatened, intimidated, and coerced Pringle into giving false testimony at Petitioner's trial.  Petitioner then filed a third motion for relief from judgment, claiming that he had newly discovered evidence.  The trial court denied Petitioner's motion on the ground that Petitioner was raising the same issues which he presented to the trial court in his previous motions and that he did not meet the exception to the rule prohibiting defendants from filing more than one motion for relief from judgment.  *See People v. LeGrone*, No. 91-011107-01 (3d Judicial Cir. Ct. Oct. 18, 2007).

The Michigan Court of Appeals denied leave to appeal the trial court's order for

---

[2] Rule 6.502(G) reads:

(1) Except as provided in subrule (G)(2), regardless of whether a defendant has previously filed a motion for relief from judgment, after August 1, 1995, one and only one motion for relief from judgment may be filed with regard to a conviction. The court shall return without filing any successive motions for relief from judgment. A defendant may not appeal the denial or rejection of a successive motion.

(2) A defendant may file a second or subsequent motion based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion. The clerk shall refer a successive motion that asserts that one of these exceptions is applicable to the judge to whom the case is assigned for a determination whether the motion is within one of the exceptions.

failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. LeGrone*, No. 285465 (Mich. Ct. App. Oct. 21, 2008). On August 6, 2009, the Michigan Supreme Court denied leave to appeal because Petitioner's motion for relief from judgment was prohibited by Michigan Court Rule 6.502(G). *See People v. LeGrone*, 769 N.W.2d 673 (Mich. 2009) (table).

## E. The Current Habeas Corpus Petition and Responsive Pleading

In 2009, Petitioner asked the Federal Court of Appeals for the Sixth Circuit for an order authorizing the Federal District Court to consider a second or successive habeas petition. The Court of Appeals granted Petitioner's request, *see In re James LeGrone*, No. 09-2108 (6th Cir. Apr. 2, 2010) (unpublished), and on May 6, 2010, Petitioner filed his habeas corpus petition in this Court pursuant to 28 U.S.C. § 2254. He claims that: (1) the state trial court abused its discretion when it concluded that his motion for relief from judgment raised the same issues that he presented in previous motions; (2) newly discovered evidence undermines confidence in the jury's verdict and establishes that Petitioner is actually innocent of the crimes for which he was convicted; (3) the prosecution threatened and coerced witnesses to withhold exculpatory evidence from the defense; and (4) the prosecution failed to disclose exculpatory evidence.

Respondent Thomas Birkett argued in an answer to the petition filed through counsel that the habeas petition is barred by the statute of limitations, that Petitioner's first two claims are not cognizable on habeas review, and that Petitioner's third and fourth claims are procedurally defaulted. In the alternative, Respondent asserts that Petitioner's claims lack merit. Petitioner replies that his claims are not barred by the statute of limitations because the factual predicate for his claim of innocence could not have been discovered

10

previously.  Petitioner also disagrees with Respondent's other arguments.  He maintains that his claims are cognizable, are not procedurally defaulted, and assert meritorious constitutional violations.

The habeas statute of limitations is not jurisdictional.  *Smith v. Ohio Dep't of Rehabilitation and Corr.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006).  Nor is procedural default a jurisdictional matter, *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005), and the Court finds it more efficient to adjudicate Petitioner's claims on the merits than to analyze whether the claims are barred by the one-year statute of limitations or by a procedural default.  Thus, the alleged procedural deficiencies are excused.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

Regardless of whether the Court defers to the state courts' rulings or reviews Petitioner's claims *de novo*, Petitioner is not entitled to habeas corpus relief.  Therefore, the

Court finds it unnecessary to determine whether the state courts adjudicated Petitioner's claims on the merits. The Court would reach the same result whether the Court deferred to the state court's decision or reviewed the issue *de novo*. *Cf. Cotto v. Herbert*, 331 F.3d 217, 252-53 (2d Cir. 2003) (declining to decide whether the state court's ruling on a constitutional claim was an "adjudication on the merits" within the meaning of § 2254(d), because the court would reach the same result under a *de novo* standard of review).

### III. Discussion

### A. The State Court's ruling on Petitioner's Motion for Relief from Judgment

Petitioner alleges that the state trial court abused its discretion when it denied his most recent post-conviction motion on the ground that the motion raised the same issues that he presented in his previous motions. Petitioner asserts that none of his issues were raised on direct appeal or in his previous motions, as claimed by the trial court. Furthermore, alleges Petitioner, his claim of newly discovered evidence provided an exception to state court rules governing second or subsequent motions. Petitioner also points out that the Federal Court of Appeals for the Sixth Circuit has determined that the information in his supporting affidavits could not have been discovered previously.

Petitioner's claim is not cognizable on habeas review because it pertains to the state court's interpretation of Michigan Court Rule 6.502(G). It is not the role of a federal habeas court to reexamine state court determinations of state law questions, because a federal court is limited to deciding whether a conviction violated federal law. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). "[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus," *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005), and a claim that some error occurred during state post-conviction proceedings is not cognizable on

12

federal habeas corpus review.  *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002).  The Court therefore declines to grant relief on Petitioner's first claim.

## B.  Actual Innocence, Intimidation of Witnesses, Suppression of Evidence

Petitioner's remaining claims concern affidavits signed by Javon Carter on April 3, 2007, and his brother Willie Pringle on November 29, 2006.  Petitioner asserts that the affidavits prove his innocence and show that the prosecution intimidated Carter and Pringle and suppressed exculpatory evidence contained in the affidavits.

### 1.  Javon Carter's Affidavit

Javon Carter states in his affidavit that the police questioned him about the robbery and shooting of Reginald Rayford in March of 1991.  A detective informed him that he was implicated in the incident and identified by someone who stayed at the drug house.  He initially told the police that he knew nothing about the shooting, but that he went to Walter Lee's home with Petitioner two weeks before the shooting to discuss selling drugs at the house.

Carter goes on to say in his affidavit that he was approached by Sharon Hughes on the day before the shooting.  Hughes stated that, if she had known Carter was Willie Pringle's brother, she would have tried to convince her boyfriend to allow Carter to sell drugs in her boyfriend's house.  Hughes also stated that she needed money, that she did not like how her boyfriend treated Carter, and that she intended to have her boyfriend robbed.  She asked Carter for a gun.  Carter refused the request, but told Hughes that he knew someone who was selling a .357 handgun for $50.  Hughes responded that she did not have any money, but, if Carter loaned her the money or acquired the gun for her, she would repay him with interest.  Carter did not trust Hughes and refused to give her any

13

money.

Carter also states in his affidavit that a police officer tore up his initial statement and told him that Sharon Hughes had already implicated Petitioner and him in the crime. Another officer promised not to charge Carter with the robbery and murder if he made a statement implicating Petitioner in the shooting. Carter agreed to say what the police wanted him to say. A detective nevertheless threatened to charge him with the robbery and murder of Reginald Rayford if he ever mentioned that Sharon Hughes had tried to obtain a gun from him to set up Walter Lee. Carter states that his trial testimony was based on what the police told him to say and that it was not entirely true.

### 2. Willie Pringle's Affidavit

Willie Pringle stated in his affidavit that he, too, was implicated in the robbery and murder of Reginald Rayford by someone who stayed at the drug house where the shooting occurred. He told police investigators that the only person he knew who lived at the Richton Street house was Sharon Hughes, who informed him a few days before the shooting that Pringle's brother, Javon Carter, had been at the drug house with Petitioner to talk with her boyfriend about selling drugs in his house. Hughes stated to Pringle that her boyfriend had denied the request, but if she had known Carter was Pringle's brother, she would have tried to convince her boyfriend to allow Carter to sell drugs out of his house. Hughes also informed Pringle that, because she needed money and did not like the way her boyfriend had treated Carter, she intended to have her boyfriend robbed. She asked Pringle for a gun, but he did want to get involved. On the following day, Hughes asked him for $50 because she knew someone who would sell her a .357 caliber handgun. Hughes promised to repay the money with "a little something extra" after her guys robbed

14

the drug house.   Pringle once again declined to get involved.

Pringle goes on to say that, when the investigator accused him of being an accomplice to the robbery and murder, he explained that he merely heard gunshots coming from the area of 2244 Richton Street and saw three men running through the vacant lot near his home and get in a car.  The investigator asked Pringle whether Petitioner was one of the men he had seen, but Pringle had responded that he knew Petitioner was elsewhere at the time because he spoke to Petitioner by telephone at his wife's house about three or four minutes before he saw the men running to a car.

Pringle states that he told the police exactly what they wanted to hear after the investigator and another police officer accused him of withholding evidence and threatened to send him to prison for the murder of Reginald Rayford.  He initially refused to say that he saw Petitioner running to the car because it was not true.  But one officer grabbed him by the shirt collar, and another officer threatened him again.  So, he agreed to testify in the manner suggested by the police officers even though his statement was untrue.

### 3.  Actual Innocence

Petitioner claims that he is entitled to relief from judgment because Carter's and Pringle's affidavits are newly-discovered evidence demonstrating that he is actually innocent of the crimes for which he was convicted.  According to Petitioner, the affidavits show that Sharon Hughes was shifting the focus at trial from her and her confederates to Petitioner, but the new evidence demonstrates that Petitioner was not one of Hughes' confederates.

Petitioner's claim of actual innocence lacks merit because "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground

15

for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In other words, "a claim of 'actual innocence' is not itself a constitutional claim . . ." *Id.* at 404. Instead, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.*

Even if Petitioner's "actual innocence" claim were cognizable, "the threshold for any hypothetical freestanding innocence claim [is] 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417). A habeas petitioner must show that "new reliable evidence establishes his innocence by a more-likely-than-not standard." *Ross v. Berghuis*, 417 F.3d 552, 556 (6th Cir. 2005). Stated differently, the petitioner must show that, "in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

The affidavits in question here were executed fourteen to fifteen years after Petitioner's trial. Although in that sense, they are new evidence, the fact that the police may have pressured Carter and Pringle into making untrue statements is not new evidence Carter testified at trial that he told the police what they wanted to hear, namely, that Petitioner went to Walter Lee's house a few days before the shooting to inquire about selling drugs at the house. (Trial Tr. vol.2, 78, 102, Mar. 3, 1992). He also claimed that the police threatened to keep him at the police station until he made a statement and that part of his statement to the police was not true. (*Id.* at 89-92.) Pringle testified that the police threatened to put him in jail for withholding evidence. Consequently, he told the police what they wanted to hear and identified Petitioner as one of the men he saw running through the

16

vacant field.  (*Id.* at 162-63, 173.)  He also testified that some of the comments in his statement were not his words.  (*Id.* at 172.)

Not only is the evidence of coercion not new evidence, it does not establish Petitioner's innocence by a more-likely-than-not standard.  The new evidence consists of affidavits, which "are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Herrera*, 506 U.S. at 417.  In addition, the affidavits were given many years after Petitioner's trial, and no satisfactory explanation has been given as to why the affiants waited so long to provide the information.

Furthermore, neither Carter, nor Pringle, were eyewitnesses to the crime.  The two eyewitnesses were Sharon Hughes and Walter Lee, who identified Petitioner before trial and at trial as the person who committed the robbery at 2244 Richton Street on March 2, 1991.

At best, the affidavits provide impeachment evidence, not direct evidence of innocence.  They impeach Sharon Hughes' testimony that she did not set up the robbery. Impeachment evidence "is a step removed from evidence pertaining to the crime itself." *Calderon v. Thompson*, 523 U.S. 538, 563 (1998).

The Court therefore rejects Petitioner's claim that Javon Carter's and Willie Pringle's affidavits establish his innocence of the crimes for which he is incarcerated.  "[W]hatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it."  *House*, 547 U.S. at 555.

### 4. Alleged Prosecutorial Intimidation of Witnesses

In his third claim, Petitioner alleges that the prosecution deprived him of effective

17

confrontation by threatening, intimidating, and coercing Javon Carter and Willie Pringle into withholding exculpatory evidence, changing their statements to the police, and testifying falsely against Petitioner.

### a.  Clearly Established Federal Law

The Confrontation Clause of the Sixth Amendment guarantees defendants in criminal prosecutions "the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  The Clause is applicable to the States through the Fourteenth Amendment."  *Idaho v. Wright*, 497 U.S. 805, 813 (1990).  A primary interest secured by the Clause is the right of cross-examination.  *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).

The rights to confront and to cross-examine witnesses also are essential to a criminal defendant's right to due process, the essence of which, is the right to defend against the State's accusations.  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  A defendant in a criminal case has the right "to seek out the truth in the process of defending himself," and "to expose to the jury facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness[es]." *Davis v. Alaska*, 415 U.S. 308, 320, 318 (1974).

The standard for finding a constitutional violation for witness intimidation is whether the words used "'could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify.'"  *Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005) (quoting *Webb v. Texas*, 409 U.S. 95, 98 (1972)).  The question is whether the prosecution's actions "'substantially interfered with any free and unhampered determination the witness might have made as to whether to testify and if so

18

as to the content of such testimony.'" *Id.* (quoting *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973)).  Even when such interference occurs, harmless-error analysis should be used.  *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001); *United States v. Foster*, 128 F.3d 949, 953 & 953 n. 4 (6th Cir. 1997).  An error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### b. Application

As noted above, Javon Carter testified that he and Petitioner went to Walter Lee's house about a week before the shooting because Carter wanted to talk with Walter.  He claimed that he was not present during the subsequent shooting, and when the police questioned him about the shooting, he stated that he did not know anything about it. He gave a statement to the police after they locked him up for a night and told him that they were going to keep him there until he made a statement.  Initially, he said that Petitioner merely went with him to Walter's house and that Petitioner did not talk to Walter, but the police did not believe that version of the facts.  So he told the police what they wanted to hear:  that he and Petitioner went to Walter's house to check it out because they intended to sell Petitioner's "dope" at the house.

Willie Pringle also testified that he changed his version of the facts after the police threatened to put him in jail.  Initially, he informed the police that he could not identify the men that he saw running through a vacant lot after he heard several gunshots.  He changed his story and identified Petitioner as one of the men he saw running through the vacant lot after a police officer threatened to put him in jail for withholding evidence if he

19

did not change his story.

Even assuming that the police pressured Carter and Pringle into changing their stories, defense counsel was permitted to cross-examine Carter and Pringle regarding their conflicting stories.  And both Carter and Pringle testified freely about how the police had intimidated them into saying what the police wanted to hear.  Thus, Petitioner's right of confrontation was not violated.

The alleged constitutional error, moreover, could not have had a substantial and injurious effect or influence on the jury's verdict.  The jury was made aware that Carter and Pringle implicated Petitioner after being threatened by the police.  In addition, eyewitnesses Sharon Hughes and Walter Lee identified Petitioner in a photographic array and at trial as the robber and shooter.  Neither Carter, nor Pringle, were eyewitnesses to the incident. Thus, the alleged error concerning Carter and Pringle was harmless, and Petitioner has no right to relief on the basis of his third claim.

### 5.  Alleged Suppression of Evidence

In his fourth and final claim, Petitioner alleges that the prosecution withheld exculpatory evidence that Sharon Hughes was involved in the robbery and the subsequent murder of Reginald Rayford and that Petitioner was not.

#### a.  Clearly Established Law

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  "There are three components [to] a true

20

*Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).   *Brady* applies to situations involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).

> "*Brady* obviously does not apply to information that is not wholly within the control of the prosecution.  There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."

*Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (internal citations and quotations omitted)).

### b.  Application

The allegation that the police pressured Javon Carter and Willie Pringle into changing their statements and implicating Petitioner in the crime was made known at trial. On direct examination by the prosecutor, Carter testified that he told the police about Petitioner being involved with drugs because that was what the police wanted to believe. (Trial Tr., vol. 2, 78, Mar. 3, 1992.)  On cross-examination by defense counsel, Carter testified that he initially informed the police that he knew nothing about the shooting and that he implicated Petitioner only after the police tore up his first statement, told him that it was a lie, locked him up for a night, and threatened to keep him at the police station until he made a statement.  (*Id.* at 88-92, 104.)

Pringle also testified about the inconsistent statements he made before trial.  He

21

claimed that, after the police threatened to put him in jail for withholding evidence, he told the police what they wanted to hear: that Petitioner was one of the men he saw running through a vacant lot after he heard gunshots. He also testified that some of the things in his statement were not true. (*Id.* at 162-63, 172-73.)

Although Carter and Pringle did not testify about Sharon Hughes' alleged conversations with them about "setting up" Hughes' boyfriend (presumably, Walter Lee), there is no credible basis for concluding that Hughes actually tried to arrange the robbery and that the prosecutor suppressed the evidence. The police apparently released Hughes after questioning her about whether she set up the robbery, and, at trial, Hughes denied setting up the robbery. (Trial Tr., vol. 2, 36, 52, Mar. 3, 1992.) Carter's and Pringle's affidavits to the contrary are suspect for the reasons given above.

> Furthermore,
>
> "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–470, 129 S. Ct. 1769, 173 L. Ed.2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (internal quotation marks omitted).

*Smith v. Cain*, __ U.S. __, __, 132 S. Ct. 627, 630 (2012).

Even if Petitioner could have impeached Hughes with information contained in Javon Carter's and Willie Pringle's affidavits, Walter Lee identified Petitioner as the man who committed the robbery and fired at his nephew. There was additional evidence that Petitioner tried to hide from the police when they went to arrest him and that the gun he possessed during the robbery could have fired the bullet that penetrated Reginald

22

Rayford's lung and heart.  Thus, there is not a reasonable probability that the result of the trial would have been different if Petitioner had been able to elicit testimony from Carter and Pringle that Hughes set up the robbery.

In conclusion, Petitioner has not alleged a true *Brady* claim.  He has not shown that the prosecution suppressed evidence or that the evidence in question was material evidence.  Petitioner therefore has no right to relief on the basis of his *Brady* claim.

### IV.  Conclusion

Petitioner has failed to show that his constitutional rights were violated.  Further, the state courts' rejection of his claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Accordingly, the petition for writ of habeas corpus [dkt. #1] is **DENIED**.

### V.  Certificate of Appealability;
### Leave to Proceed *In Forma Pauperis* on Appeal

Before Petitioner may appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . .   When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability]

23

should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists could disagree with the Court's resolution of Petitioner's third and fourth claims regarding the prosecution's alleged intimidation of witnesses and suppression of evidence.  At a minimum, reasonable jurists could conclude those issues deserve encouragement to proceed further.  Consequently, a certificate of appealability may issue on habeas claims three and four.

Petitioner's first claim merely challenges the state trial court's ruling on a state procedural matter, and the second claim (actual innocence) is not an independent basis for habeas corpus relief.  Reasonable jurists would not find it debatable whether the Court's procedural rulings on those claims are correct or whether the first and second claims state valid assertions of the denial of a constitutional right.  The Court therefore declines to issue a certificate of appealability on Petitioner's first and second claims.  Petitioner nevertheless may proceed *in forma pauperis* on appeal because he was permitted to proceed *in forma pauperis* in the District Court, and an appeal could be taken in good faith.  Fed. R. App. P. 24(a)(3)(A).

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  October 31, 2012

24

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 31, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager